Cathy PARSELLS, Plaintiff,

v.

MANHATTAN RADIOLOGY GROUP, L.L.P., Frank C. Lyons, Michael Sheffield, Gregory J. Welle and William Volkmann, II, Defendants.

No. 02–2008–JWL.

United States District Court, D. Kansas.

April 3, 2003.

Deena Hyson Bailey, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, John D. Conderman, Arthur-Green, LLP, Manhattan, KS, Teresa L. Mah, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for Manhattan Radiology Group, L.L.P., Frank C. Lyons, Gregory J. Welle, H. William Volkmann, II, Michael Sheffield.

Michael J. Coffman, Coffman, Jones & Gilliland, Lyndon, KS, Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Topeka, KS, for Cathy Parsells.

### MEMORANDUM & ORDER

LUNGSTRUM, Chief Judge.

This suit stems from plaintiff's working relationship with defendants and the termination of that relationship. Specifically, plaintiff, a radiologist formerly affiliated with defendant Manhattan Radiology Group, L.L.P., claims that defendant MRG unlawfully denied her full-time employment based on her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and unlawfully terminated her part-time employment in retaliation for plaintiff's asserting her rights under Title VII. Based on these same assertions, she also seeks to recover under the Kansas Act Against Discrimination, K.S.A. § 44–1001 et seq., against both defendant MRG and the individual defendants, all partners in the radiology group. Finally, plaintiff sets forth two state law claims-a wrongful discharge claim based on plaintiff's alleged whistleblower status and a claim for tortious interference with a prospective business advantage.

This case is presently before the court on defendants' motion for summary judgment (doc. # 78) on each of plaintiff's claims and plaintiff's motion for leave to file a surreply (doc. # 88). As set forth in more detail below, plaintiff's motion for leave to file a surreply is denied and defendants' motion for summary judgment is granted in part and denied in part. In summary, defendants' motion is granted

with respect to plaintiff's Title VII claims because defendant MRG is not an "employer" within the meaning of Title VII. The motion is also granted with respect to plaintiff's KAAD claims as to the individual defendants and, in light of the court's conclusion that plaintiff was an independent contractor rather than an employee of MRG, is granted as to plaintiff's claim that her discharge violated the KAAD. Defendants' motion is also granted with respect to plaintiff's claim for punitive damages under the KAAD and damages for pain and suffering in excess of $2000. The motion is further granted to the extent plaintiff purports to assert a claim that defendants failed to offer her a full-time position in retaliation for plaintiff's opposition to alleged discrimination as such claim was not preserved in the pretrial order. The motion, however, is denied with respect to plaintiff's claim that defendants failed to offer her a full-time position based on her gender. Finally, defendants' motion is granted with respect to plaintiff's tortious interference claim. With respect to plaintiff's retaliatory discharge claim, plaintiff is ordered, as explained more fully below, to show cause in writing on or before Monday, April 14, 2003 why this claim should not be dismissed. If she does not respond by that date, her claim will be dismissed. If she does respond, the defendants shall have until April 21, 2003 to reply.

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Cathy Parsells is a doctor of osteopathy. Beginning in the summer of 1996, plaintiff served two years as a diagnostic radiologist at the Irwin Army Community Hospital, located in Fort Riley, Kansas. When she arrived at Fort Riley, plaintiff met defendant Dr. Gregory Welle, who at the time was serving as the Chief of Radiology at Irwin Army Hospital. Dr. Welle was discharged from the Army in 1997 and became a full-time physician employee at defendant Manhattan Radiology Group. At that time, defendant MRG was a general partnership comprised of physicians who provide radiology services to primary care physicians, hospitals and other facilities.[1] When plaintiff was discharged from the Army in August 1998, she contacted Dr. Welle to inquire as to whether there was any work available for her with MRG. Dr. Welle arranged for plaintiff to meet defendant Dr. Frank Lyons and the three of them discussed the possibility of plaintiff doing some work for MRG. Plaintiff advised Drs. Welle and Lyons that she was only interested in a part-time position, at least until her child started going to school. Shortly after this meeting, plaintiff began doing some part-time work for MRG.[2] When plaintiff started working for defendant MRG in 1998, the partners in the group were Dr. Lyons, Dr. Welle, defendant Dr. William Volkmann and defendant Dr. Michael Sheffield.

Plaintiff's primary responsibility while working for MRG was to read and interpret x-ray films. In performing this task, plaintiff traveled to various hospitals in the area for which MRG provided radiological services, including Mercy Health Center, Wamego City Hospital and Onaga Community Hospital. While plaintiff worked in MRG's offices on occasion, the record reflects that she spent most of her time working in one of the area hospitals. For

---

1. Defendant MRG is now a limited liability partnership. Throughout the time that plaintiff was affiliated with MRG, however, it was a general partnership.

2. At no time did the parties execute a written contract concerning the working relationship.

purposes of her work schedule, plaintiff submitted to defendants early on in their working relationship a calendar identifying the weeks that she wanted to work and the weeks that she did not want to work for the years 1999 and 2000. Plaintiff identified nine weeks that she would be available to work during the second-half of 1999 and ten weeks that she would be available to work during 2000. While the record reflects that defendants, in early 2000, were no longer relying on plaintiff's submission, it is uncontroverted that defendants did not schedule plaintiff to work at any time without first seeking her permission. At the end of each month, plaintiff would submit an invoice to MRG stating how many hours she had worked that month. Upon receipt of plaintiff's invoice, defendant MRG issued a paycheck to plaintiff reflecting compensation at the rate of $100 per hour.

During the time that plaintiff worked for MRG, MRG did not pay any Social Security taxes for plaintiff, no taxes were withheld from payments made to plaintiff and MRG reported plaintiff's earnings to the IRS via Forms 1099. Plaintiff paid her taxes as a self-employed person. While working for MRG, she did not receive the job-related fringe benefits that MRG provided to its employees, including sick leave, vacation time and health insurance. Moreover, plaintiff worked on a part-time basis for other radiological practice groups in the area during the time she worked for MRG.

At some point after plaintiff began working for MRG, defendants began to receive complaints about plaintiff's personality, attitude and demeanor from a variety of people with whom plaintiff worked. For example, the CEO at Wamego City Hospital complained to Drs. Welle and Lyons that plaintiff had loud outbursts and, on one occasion, "hollered" into the hallway of the hospital that the hospital was going to be sued because the quality of the films she was reading was so poor. Nonetheless, defendants continued to send plaintiff to Wamego and plaintiff denies that defendants ever talked to her about her behavior at Wamego. Similarly, defendants contend that Onaga Community Hospital requested that MRG cease sending plaintiff there to read x-rays and even threatened to stop doing business with MRG entirely if they continued to send plaintiff to Onaga. The record reflects, however, that defendants continued to send plaintiff to read films at Onaga. Employees at Mercy Health Center also reported to defendants that plaintiff was difficult to work with and had a "short wick." Again, after receiving these reports, defendants continued to send plaintiff to Mercy Health Center.

In November 1999, defendants interviewed Dr. Sandford Kruger for a full-time physician position. During this time frame, according to plaintiff, she had a conversation with Dr. Lyons in which she believes she made it clear that she was interested in full-time employment. Defendants and Dr. Kruger arrived at an agreement in January 2000 and Dr. Kruger commenced his employment with MRG in May 2000. Plaintiff did not learn that defendants had extended an offer to Dr. Kruger until early March 2000. Upon learning this information, she expressed to Dr. Welle and Dr. Lyons that she was upset and disappointed that she had not been offered the position. In April 2000, plaintiff advised Dr. Sheffield that she was upset that she had not been offered the position.

In the summer of 2000, defendants offered a full-time physician position to Dr. Tom Place. Dr. Place had replaced plaintiff as Chief of Radiology at Fort Riley when plaintiff left the Army in 1998. After coming to Fort Riley, Dr. Place began

talking to MRG about the possibility of affiliating with MRG upon his discharge from the Army. Dr. Place stayed in touch with MRG throughout his military service and, in June 1999, he formally interviewed with MRG. In the summer of 2000, the details of the agreement were finalized. In early September 2000, plaintiff learned that Dr. Place had been offered a full-time position to begin in September 2001, when Dr. Place's military service was complete. At that time, plaintiff consulted with an attorney and her attorney arranged a meeting with defendants to discuss plaintiff's working relationship with defendants and, according to plaintiff, to discuss plaintiff's belief that she was the victim of gender discrimination. The meeting took place on September 28, 2000. During the course of the meeting, defendants terminated their working relationship with plaintiff.

In October 2000, plaintiff opened her own radiology practice. She closed that practice in May 2001 allegedly because defendants' conduct after plaintiff opened her practice rendered plaintiff unable to build a successful practice. Specifically, plaintiff claims that defendants unlawfully converted from Mercy Health Center certain medical equipment necessary for plaintiff to perform radiological services and that defendants improperly read films at Mercy Health Center that were designated for plaintiff.

Additional facts will be provided as they pertain to plaintiff's particular claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke,*

*Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

■ In the pretrial order, plaintiff alleges that defendants, on the basis of plaintiff's gender, failed to offer her the full-time positions filled by Drs. Kruger and Place, claims that both parties characterize as failure-to-hire or failure-to-promote claims.[3] She further alleges that defendants terminated their working relationship with plaintiff on the basis of plaintiff's gender and/or in retaliation for plaintiff's complaints of discrimination. Plaintiff's failure-to-hire or failure-to-promote claims as well as her discharge claims are based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Kansas Act Against Discrimination, K.S.A. § 44–1001 et seq. ("KAAD"). Plaintiff asserts her Title VII claims only against

defendant MRG and asserts her KAAD claims against defendant MRG as well as the individual defendants. Plaintiff also asserts two state tort claims against all defendants, one for tortious interference with a prospective business advantage based on defendants' conduct after plaintiff opened her own radiology practice and one for retaliatory discharge based on plaintiff's alleged whistleblower status. Defendants move for summary judgment on all claims.

## A. Title VII Claims

■ Plaintiff brings her retaliation and gender discrimination claims pursuant to both Title VII and the KAAD. Title VII's anti-discrimination provision makes it unlawful for an "employer" to "refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, ·or national origin." *See* 42 U.S.C. § 2000e–2(a)(1). Defendant MRG is subject to Title VII, then, only if, at the time of the alleged discrimination, it met the statutory definition of "employer," to wit: "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *See Walters v. Metropolitan Educational Enterprises, Inc.,* 519 U.S. 202, 205, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting 42 U.S.C. § 2000e(b)).

---

**3.** In her papers, plaintiff contends that defendants failed to offer her the full-time position filled by Dr. Place on the basis of her gender and/or in retaliation for plaintiff's complaint that defendants' refusal to consider plaintiff for the position filled by Dr. Kruger was based on plaintiff's gender. As defendants correctly note, however, plaintiff did not pre-

serve in the pretrial order any retaliation claim stemming from defendants' decision to hire Dr. Place. This claim, then, has been waived and summary judgment is granted with respect to the claim. *See Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir.2002) (claims not included in the pretrial order are waived).

In its motion, defendant MRG argues that summary judgment is appropriate on plaintiff's Title VII claims because it is not an "employer" within the meaning of § 2000e(b). Specifically, defendant contends that the general partners of MRG (including defendants Volkmann, Sheffield, Welle and Lyons) cannot be considered "employees" for purposes of determining whether MRG is an "employer" subject to the provisions of Title VII and that, assuming those partners are not counted, MRG simply did not have the requisite number of employees during the relevant time period. Acknowledging the Tenth Circuit's holding in *Wheeler v. Main Hurdman*, 825 F.2d 257 (10th Cir.1987), that bona fide general partners are not considered "employees" for purposes of the federal anti-discrimination acts, plaintiff concedes that defendant MRG's partners cannot be counted toward the number of employees and that, excluding the partners, defendant MRG did not have the requisite number of employees during the relevant time period. Plaintiff, thus, expressly concedes that defendant MRG is entitled to summary judgment on plaintiff's Title VII claims. Defendant's motion, then, is granted with respect to plaintiff's Title VII claims.

*B. KAAD Claims*

 Unlike Title VII, the KAAD applies to employers with 4 or more employees and, thus, provides protection against discrimination by many employers that do not fall within the scope of Title VII. *See* K.S.A. § 44–1002(b). Defendant MRG had more than 4 employees during the relevant time period and, thus, is considered an "employer" covered by the KAAD. Defendants move for summary judgment on plaintiff's KAAD claims on the grounds that plaintiff failed to exhaust her administrative remedies under the KAAD; that plaintiff is an independent contractor rather than an employee; and that plaintiff has

failed to establish the elements of her claims in any event. The individual defendants also move for summary judgment on the grounds that the KAAD does not contemplate individual liability for discrimination. Finally, defendants assert that plaintiff cannot recover punitive damages under the KAAD and that plaintiff can recover a maximum of $2000 in damages for pain and suffering. The court addresses these arguments in turn.

1. Exhaustion of Remedies

In its motion for summary judgment, defendants urge that plaintiff's claims under the KAAD must be dismissed because plaintiff failed to exhaust her administrative remedies. More specifically, defendants assert that plaintiff failed to file a petition for reconsideration with the Kansas Human Rights Commission (KHRC) after the KHRC issued its "no probable cause" finding. Plaintiff admits that she did not file a petition for reconsideration, but maintains that she was not required to do so. The court, then, must determine whether a plaintiff who receives a "no probable cause" finding from the KHRC is required to file a petition for reconsideration prior to bringing suit in court. As explained below, the court concludes that a plaintiff need not file a petition for reconsideration when that individual has received a no probable cause finding from the KHRC. The court, then, rejects defendants' argument and concludes that dismissal of plaintiff's claims is not warranted on this basis.

 It is beyond dispute that an employee must completely exhaust his or her administrative remedies under the KAAD before that employee can seek judicial relief. *See Sandlin v. Roche Laboratories, Inc.*, 268 Kan. 79, 80, 991 P.2d 883 (1999). According to defendants, part of that exhaustion requirement is that a plaintiff file

a petition for reconsideration once he or she receives an unfavorable determination from the KHRC. In support of their argument, defendants point to K.S.A. § 44–1010, which states:

Any party being dissatisfied with any order or decision of the commission may petition for reconsideration in accordance with the provisions of K.S.A. § 77–529 and amendments thereto. No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall petition for reconsideration as herein provided. No party shall, in any court, urge or rely upon any ground not set forth in the petition for reconsideration.

Section 77–529, in turn, provides that the filing of a petition for reconsideration pursuant to section 44–1010 is a prerequisite for seeking judicial review. *See* K.S.A. § 77–529; *accord Sandlin*, 268 Kan. at 83–84, 991 P.2d 883 (petition for reconsideration is a prerequisite to judicial review of any order or decision of the KHRC); *United Steelworkers of America, Local No. 4706 v. Kansas Commission on Civil Rights*, 253 Kan. 327, 855 P.2d 905 (1993) ("no cause of action for judicial review even accrues until the party has sought reconsideration").

Plaintiff contends that section 44–1010 applies only to those orders or determinations that are subject to judicial review and, thus, does not apply to a "no probable cause" determination. *See Sandlin*, 268 Kan. at 83, 991 P.2d 883 ("Where the KHRC makes a finding of 'no probable cause,' the claimant is served notice, and such finding is not subject to judicial review."). Indeed, plaintiff's interpretation of section 44–1010 is consistent with the Kansas Supreme Court's decision in *Van Scoyk v. St. Mary's Assumption Parochial School*, 224 Kan. 304, 580 P.2d 1315 (1978). In *Van Scoyk*, the court held, as subsequently explained by Judge Briscoe (at the

time, a judge on the Kansas Court of Appeals) that once a "no probable cause" determination is made by the KHRC, the purposes and requirements of the exhaustion doctrine are satisfied and an aggrieved party may bring an independent civil action in the district court based on an alleged violation of K.S.A. § 44–1009. *See Mattox v. Dep't of Transportation*, 12 Kan. App.2d 403, 405, 747 P.2d 174 (1987); *Van Scoyk*, 224 Kan. at 306–07, 580 P.2d 1315 (upon the entry of a no probable cause finding, "the doors of the agency were closed" and plaintiffs were thereafter free to pursue the matter further by bringing an independent tort action in district court). As Judge Briscoe reiterated in *Mattox*, "[o]nce the Commission issues a "No Probable Cause" determination, the statutory procedure is at an end since the aggrieved party may not appeal the determination." *Mattox*, 12 Kan.App.2d at 405, 747 P.2d 174. Significantly, in *Mattox*, the Court specifically concluded that the plaintiff had exhausted his administrative remedies under the KAAD when he filed a suit for damages after receiving a no probable cause determination from the KHRC and without filing a petition for reconsideration. *Id.* at 405–06, 747 P.2d 174. That precise issue, however, was not before the court, as the court ultimately concluded that plaintiff failed to exhaust his administrative remedies under the Civil Service Act. *Id.* at 406, 747 P.2d 174.

In light of the Kansas Supreme Court's decision in *Van Scoyk*, and Judge Briscoe's application of that decision in *Mattox*, the court necessarily concludes that plaintiff here was not required to file a petition for reconsideration upon the KHRC's no probable cause determination. Summary judgment on this basis, then, is denied. *See Ditch v. Board of County Comm'rs of Shawnee County*, 669 F.Supp. 1553, 1554 (D.Kan.1987) (after granting summary judgment on plaintiff's KAAD claims for

failure to file a petition for reconsideration upon no probable cause determination, court, on reconsideration, concluded that plaintiffs were not required to file a petition for reconsideration under *Van Scoyk* ).[4]

### 2. Independent Contractor Status

■ In support of their motion for summary judgment, defendants contend that plaintiff was an independent contractor and, thus, not an "employee" for purposes of the KAAD. As set forth below, the court agrees that the uncontroverted facts demonstrate that plaintiff was an independent contractor. Thus, she is not entitled to the protections of the KAAD, at least with respect to her claims that defendants' termination of her employment violated the KAAD. Indeed, plaintiff seems to concede in her papers that her discharge claims under the KAAD fail as a matter of law if this court finds that she is an independent contractor. However, plaintiff's status as an independent contractor is not necessarily fatal to her claims that defendants failed to hire or promote her to a full-time position. *See Aguirre v. McCaw RCC Communications, Inc.*, 953 F.Supp. 1222, 1224–25 (D.Kan.1997) (plaintiff does not have to be an employee of the defendant to state a cause of action for failure-to-hire or failure-to-promote, so long as plaintiff can show that he or she is seeking to create an employment relationship within the meaning of Title VII or the KAAD). Thus, the court declines to address the merits of plaintiff's claims that her termination violated the KAAD as summary judgment is warranted on those claims in light of plaintiff's status as an independent contractor. The court does, however, address the merits of plaintiff's claims that defendants failed to hire or promote her to a full-time position because, assuming plaintiff can demonstrate that the full-time position she sought was not an independent contractor position,[5] her status as an

**4.** In their reply brief, defendants for the first time assert that K.S.A. § 44–1005(i) is "one of the statutes that control [sic] this issue" and because that section was amended in 1995, well after the *Van Scoyk* decision, the *Van Scoyk* decision is severely undermined. According to defendants, section 44–1005(i) identifies the limited circumstances under which an individual is excused from filing a petition for reconsideration-circumstances that are not present here. Defendants point to no authority, however, supporting their interpretation of section 44–1005(i) and the court has found no cases suggesting that section 44–1005(i) undermines the holding in *Van Scoyk* in any respect. In fact, the Kansas Supreme Court has indicated that section 44–1005(i) was intended to address only those situations in which the Commission has issued no finding whatsoever within 300 days of the filing of the complaint. *See Sandlin*, 268 Kan. at 84–85, 991 P.2d 883. In other words, where a petitioner previously was required to wait for a decision from the Commission prior to filing suit in district court, section 44–1005(i) now enables a petitioner to request that the Commission dismiss the complaint if the Commission has issued no finding within 300 days after the complaint was filed. Section 44–1005(i) further states that the Commission is required to dismiss a complaint under such circumstances and the petitioner is then permitted to file suit in district court without the need to file a petition for reconsideration. *See* K.S.A. § 44–1005(i). The court then, rejects defendants' argument. Moreover, as defendant's interpretation of section 44–1005(i) is the first of three issues on which plaintiff seeks to file a surreply, the court denies that request as it has rejected defendants' argument in any event.

**5.** The record before the court is insufficient for the court to resolve at this juncture whether the full-time position that plaintiff desired was an independent contractor position. Indeed, the parties do not address this issue in their papers. Thus, the court assumes, without deciding, that plaintiff sought an employer-employee relationship with defendants when she sought a full-time position with defendants. The parties should be prepared to present at trial any evidence relating to this issue.

independent contractor is irrelevant to those claims.

 Courts attempting to distinguish between employees and independent contractors for the purposes of anti-discrimination statutes have applied a variety of tests-the common law agency inquiry; the "hybrid" common law-economic realities method; and the single employer or true economic realities test. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir.1998). The Tenth Circuit has endorsed the use of the hybrid approach for purposes of determining whether a plaintiff is an employee of a particular entity for Title VII purposes. *See Lambertsen v. Utah Dep't of Corrections*, 79 F.3d 1024, 1028 (10th Cir.1996).[6] Although this approach considers the economic realities of the working relationship, "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." *Oestman v. National Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir.1992) (applying hybrid test to determine whether insurance agent was an "employee" for purposes of ADEA) (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979)); *accord Hartford Underwriters Ins. Co. v. Kansas Dep't of Human Resources*, 272 Kan. 265, 270, 32 P.3d 1146 (2001) (primary test used in determining whether an employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee and the right to direct the manner in which the work is to be performed). Other factors to consider when applying the hybrid test include the following:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Oestman*, 958 F.2d at 305 (quoting *Spirides*, 613 F.2d at 832); *accord Lambertsen*, 79 F.3d at 1028. No single factor is conclusive. *Lambertsen*, 79 F.3d at 1028 (citing *Oestman*, 958 F.2d at 305). Rather, the court must consider the totality of the circumstances surrounding the working relationship between the parties. *Id.* (citing *Oestman*, 958 F.2d at 305).

The uncontroverted facts here, taken as a whole, demonstrate that plaintiff was an independent contractor and not an employee. *See Mitzner ex rel. Bishop v. Kansas Dep't of Social and Rehabilitation Servs.*, 257 Kan. 258, 261, 891 P.2d 435 (1995) ("Where the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor."). As set forth above, the focus of the hybrid test is the employer's right to control the "means and manner" of the worker's performance.

---

6. Because Kansas courts have applied the standards of federal anti-discrimination statutes to KAAD claims, the court will utilize the standards espoused by federal courts in cases under the federal anti-discrimination statutes in analyzing whether plaintiff was an independent contractor. *See Aguirre*, 953 F.Supp. at 1224 n. 3.

Here, defendants did not control any aspect of plaintiff's work and she was unsupervised in nearly all respects. In fact, plaintiff usually spent her work day not in defendants' office but at one of the hospitals for which defendant MRG provided radiological services. While plaintiff contends in her papers that she was "sometimes" supervised by defendants, she offers only one example of a time when she was allegedly supervised. Specifically, in her deposition, plaintiff testified that on one occasion, defendant Gregory Welle advised her that certain films that plaintiff preferred were not typically used at Mercy Health Center. No reasonable jury could conclude from this isolated example that Dr. Welle supervised plaintiff's work in any respect and plaintiff offers no other evidence to support the notion that defendants supervised her work.

Moreover, defendant did not require plaintiff to work particular hours or, for that matter, to work at all. In that regard, the uncontroverted testimony in the record reflects that plaintiff provided to defendants a list of the weeks that she desired to work and a list of the weeks that she did not want to work. Although defendants stopped relying on that list around March 2000, defendants nonetheless asked plaintiff's permission prior to scheduling her for any days or weeks that she had not previously indicated a willingness to work. These undisputed facts severely undermine plaintiff's claim. *See Lambertsen*, 79 F.3d at 1028 (affirming district court's determination on summary judgment that plaintiff was not an employee where there was no evidence that the defendant controlled the means or manner in which plaintiff performed her day-to-day work); *Oestman*, 958 F.2d at 306 (fact that appellant's performance was "subject to virtually no restrictions" supported finding on summary judgment that he was an independent contractor and not an employee under ADEA; appellant set his own working hours and was generally free to work as he chose).

Other aspects of the working relationship between the parties also lead to the conclusion that plaintiff was an independent contractor rather than an employee. Plaintiff was not afforded the job-related fringe benefits that defendant MRG afforded to its employees, including sick leave, vacation and health insurance. While defendant MRG paid for plaintiff's malpractice insurance for 2002, plaintiff has not demonstrated how this shows that she is an employee, particularly in light of the weight of evidence demonstrating that she is an independent contractor. Moreover, defendant MRG did not pay social security taxes for her and no taxes were withheld from payments to plaintiff. These facts are all relevant and significant considerations when applying the hybrid test. *See Oestman*, 958 F.2d at 306 (fact that appellees did not withhold taxes from appellant's pay and did not pay social security taxes for him supported finding that appellant was an independent contractor). It is also significant that plaintiff filed her taxes as a self-employed individual. *See id.* (fact that appellant filed his taxes as a self-employed individual supported finding that appellant was an independent contractor). Similarly, defendant MRG reported plaintiff's earnings to the IRS via Forms 1099, as opposed to Forms W–2, which were utilized to report the earnings of MRG employees.

In an effort to persuade the court that she was an employee of defendant MRG, plaintiff asserts that defendant MRG had "control over payment of the plaintiff's compensation and the amount of her hourly rate." In that regard, the uncontroverted evidence demonstrates that plaintiff would submit to defendants at the end of each month an invoice stating how many hours she worked during the month. De-

fendants compensated plaintiff at the rate of $100 per hour and payment was issued upon receipt of plaintiff's invoice. This evidence, however, simply does not bear on defendants' right to control the manner and means of plaintiff's work performance, nor does it bear on any of the other factors relevant to the application of the hybrid test. Moreover, while plaintiff highlights that she was paid by the hour rather than per procedure, this fact is insufficient to permit a jury to conclude that plaintiff was an employee when the totality of the circumstances surrounding the parties' working relationship demonstrates otherwise. In fact, if anything, it bolsters defendants' position in that few if any hourly wage earners command a $100 per hour figure while classic independent contractors, such as private practice lawyers, frequently do.

Plaintiff also asserts that she was an employee of defendant MRG because MRG furnishes the place of work (at least in the sense that it scheduled her to work at various hospitals) and the equipment used by plaintiff on those occasions when she worked at MRG's offices. Consideration of whether the "employer" or the individual furnished the place of work and the equipment used is certainly one factor in assessing the nature of the working relationship between the parties. However, the importance of the factor depends on the nature of the work involved and whether the "employer" requires the work to be done on its premises (suggesting control over the worker) when, in fact, the work could be performed elsewhere. See Lowen Corp. v. U.S., 1993 WL 245960, at *7 (D.Kan. June 14, 1993). It is uncontroverted that the vast majority of plaintiff's work was not performed on defendant MRG's premises; it was performed at one of several hospitals where, as previously noted, MRG exercised little if any control over plaintiff. The fact that defendant MRG assigned plaintiff to work at certain hospitals does not indicate that it had any control over plaintiff's work at those hospitals. Similarly, the fact that plaintiff used defendant MRG's equipment on the occasions when she read films at MRG hardly indicates that she was an employee of MRG, particularly as it is uncontroverted that she utilized the radiological equipment and personnel that were provided by each of the hospitals that she visited and that she spent more time in those hospitals than at defendant's office. Of course, plaintiff would not be considered an employee of Mercy Health Center or Wamego Hospital simply because she used their equipment (sophisticated medical equipment that she would be unlikely to own herself) while working in the hospital.

Similarly, plaintiff urges that her work was a part of the regular work of defendant MRG because MRG coordinated her schedule with the schedules of other radiologists and because plaintiff's billings were done through MRG. However, the mere coordination of schedules, particularly when plaintiff in large part dictated her own schedule, does not demonstrate that plaintiff's work was "integrated" into MRG's business operations in the absence of evidence that plaintiff was subject to direction and control by MRG. See id. at *5. Stated another way, the fact that MRG coordinated plaintiff's schedule with the schedules of other radiologists is insufficient to permit a reasonable jury to conclude that plaintiff was an employee of defendant MRG.

Finally, plaintiff asserts that she was an employee of defendant MRG based on defendants' use of the word "employment" on two occasions and defendants' reference to the concept of "employment at will." Specifically, plaintiff highlights that defendants stated in their answer to plaintiff's administrative charge before the KHRC that "Complainant's employment began in August of 1998," and that defendants'

counsel, during plaintiff's termination meeting, stated that Kansas was an at-will employment state and that his clients intended to terminate plaintiff's employment. Plaintiff's suggestion that the court elevate form over substance is not persuasive. As an initial matter, the term "employment" does not necessarily relate only to an employee-employer relationship and is often used to describe an independent contractor relationship. *See, e.g., U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156 (10th Cir.1999) ("Texas Services employed emergency care physicians as independent contractors . . . ."); *Borden v. United States,* 949 F.2d 401, 1991 WL 261700, at *3 (10th Cir. Dec.6, 1991) ("The foregoing facts do not indicate that the United States and Mr. Chote intended to enter into any type of employment relationship, be it employer/independent contractor or employer/employee."); *Hauser v. Public Service Co. of Colorado,* 797 F.2d 876, 877 (10th Cir.1986) ("Hauser was an independent contractor employed by Cooper Drilling Company . . . ."); *McCubbin ex rel. McCubbin v. Walker,* 256 Kan. 276, 288–89, 886 P.2d 790 (1994) ("All parties seem to agree that McCubbin's employment relationship with Moser was either as an employee or as an independent contractor."). Moreover, neither defendants' use of the word "employment" nor defendants' counsel's one isolated reference to "employment at will" made at the end of the relationship indicates that defendants intended to create or maintain an employer/employee relationship with plaintiff. In the absence of evidence that defendants intended to maintain an employer-employee relationship with plaintiff (or plaintiff with defendants for that matter), the court attaches no significance to defendants' passing use of the word "employment."

In sum, based on the totality of the circumstances surrounding the working relationship between plaintiff and defendants, the court concludes that plaintiff, as a matter of law, was an independent contractor. Accordingly, the court grants defendants' motion for summary judgment with respect to plaintiff's claim that her termination violated the KAAD.

### 3. Merits of Failure–to–Hire Claims

 Plaintiff contends that defendants discriminated against her on the basis of her gender by failing to offer her a full-time position. As plaintiff has no direct evidence of discrimination, the court analyzes plaintiff's discrimination claim under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1249 (10th Cir.2002). To establish a prima facie case in the failure-to-hire context, plaintiff must demonstrate that (1) she belongs to a protected class; (2) she applied and was qualified for a job for which defendant was seeking applicants; (3) despite her qualifications, plaintiff was rejected; and (4) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1238 (10th Cir.2002) (quoting *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1226 (10th Cir.2000)).

In their motion for summary judgment, defendants urge that plaintiff cannot establish a prima facie case of discrimination because she never applied for or expressed an interest in a full-time position. The court rejects this argument. The record reflects that in March 2000, plaintiff stated to Dr. Welle and Dr. Lyons that she was upset that MRG had not offered her the position given to Dr. Kruger. Although defendants urge that plaintiff did not tell anyone in March 2000 that she wanted to

work full-time, a reasonable jury could conclude that plaintiff sufficiently communicated her desire for full-time employment by expressing disappointment when defendants did not offer her the full-time position offered to Dr. Kruger. Thus, a reasonable jury could conclude that defendants knew that plaintiff would be interested in the full-time position offered to Dr. Place in the summer of 2000. *See Bennett v. Quark, Inc.,* 258 F.3d 1220, 1228 (10th Cir.2001) ("To establish a prima facie case for failure to promote, plaintiff must show, among other things, that she applied for-or at least sought-the position at issue."). The evidence is less clear concerning whether plaintiff had expressed an interest in full-time employment prior to January 2000, when defendants reached an agreement with Dr. Kruger. Plaintiff testified in her deposition that she never expressly advised defendants that she wanted full-time employment but that it was her belief "that they understood" that she wanted full-time employment based on various conversations that she had with the partners. In essence, plaintiff testified that she does not know how she communicated to defendants, prior to January 2000, that she wanted to be considered for full-time employment but she believes "that [she] made that clear." While plaintiff's evidence in this regard may be thin, the court bears in mind that a plaintiff's prima facie burden is not an onerous one. *See Goodwin v. General Motors Corp.,* 275 F.3d 1005, 1012 (10th Cir.2002). If a jury believes plaintiff's testimony, it could conclude that plaintiff sufficiently communicated to defendants, prior to January 2000, that she was interested in full-time employment.

■ As plaintiff has established a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their hiring decisions. *See English v. Colorado Dep't of Corrections,* 248 F.3d 1002, 1008 (10th Cir.2001) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). According to defendants, they initially did not offer plaintiff a full-time position because she never made anyone aware that she was interested in such a position and that, at some point thereafter, they determined that plaintiff would not be able to meet the demands of a full-time practice based on the complaints they received concerning plaintiff's "temper tantrums and outbursts" which, according to defendants, seemed to occur more frequently when plaintiff perceived the workload to be demanding. Defendants have satisfied their "exceedingly light" burden to provide nondiscriminatory reasons for their actions. *See Anaeme v. Diagnostek, Inc.,* 164 F.3d 1275, 1279 (10th Cir.1999).

Plaintiff, then, may resist summary judgment only by presenting evidence that defendants' reasons are pretextual (*i.e.,* unworthy of belief) or by otherwise introducing evidence of a discriminatory motive. *See Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir.2002) (citing *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1137 (10th Cir.2000)). Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997)). When assessing whether plaintiff has made an appropriate showing of pretext, the court considers the evidence as a whole. *Id.* (citation omitted).

Plaintiff has come forward with evidence from which a reasonable jury could conclude that defendants' proffered reasons for their hiring decisions are pretextual.

Summary judgment, then, is denied on these claims. With respect to defendants' assertion that they did not know that plaintiff was interested in a full-time position, there is evidence in the record, as explained above in connection with plaintiff's prima facie case, from which a jury could reasonably conclude that plaintiff had communicated to defendants her interest in obtaining a full-time position with MRG. As this evidence casts some doubt on defendants' assertion that it had no knowledge of plaintiff's interest, it is sufficient for plaintiff to withstand summary judgment. With respect to defendants' assertion that they did not offer her a full-time position in light of various complaints they received concerning plaintiff's behavior, including her mistreatment of staff members at the various hospitals she visited on MRG's behalf, plaintiff highlights that defendants continued to send her to these hospitals even after the hospitals allegedly threatened to cease utilizing MRG if they continued to send plaintiff to the hospital. The court agrees with plaintiff that a reasonable jury could conclude from this evidence that defendants did not honestly believe that plaintiff's behavior was problematic. Moreover, in his deposition, Dr. Lyons testified that if he had known that plaintiff was interested in a full-time position, he would have considered her for the position. This, too, reflects that plaintiff's behavior issues were not as serious as defendants now contend.

In short, plaintiff's evidence casts doubt on defendants' proffered reasons for their hiring decisions. Summary judgment, then, is denied on plaintiff's claims that defendants, based on plaintiff's gender, refused to offer her the full-time positions offered to Drs. Kruger and Place.

**4. Individual Liability**

 The individual defendants move for summary judgment on plaintiff's KAAD claims, contending that individual liability under the KAAD is inappropriate. While plaintiff appears to acknowledge the general rule that supervisors cannot be individually liable under the KAAD, *see, e.g., Rhodes v. Schaefer,* 2002 WL 826471, *3 (D.Kan. Mar.20, 2002), she contends that the individuals here should be held liable because they are general partners rather than mere supervisors. While plaintiff does not use the phrase "alter ego," she essentially makes that argument, suggesting that where an individual is the "equivalent" of the employer entity, then the individual is subject to liability. Under the alter ego theory, some courts have held that "a supervisor may be liable as an 'employer' under Title VII when the supervisor's role is more than that of a mere supervisor but is actually identical to that of the employer." *Curcio v. Chinn Enters., Inc.,* 887 F.Supp. 190, 194 (N.D.Ill. 1995). The Tenth Circuit has not addressed the narrow issue of whether a supervisor can be deemed an "employer" subject to Title VII liability in his individual capacity under an alter ego theory. It has held, in cases not raising alter ego arguments, that individuals are not proper party defendants to Title VII suits. *Haynes v. Williams,* 88 F.3d 898 (10th Cir.1996) (applying general rule of no individual liability under Title VII). The Tenth Circuit has recognized, however, that there may be instances when corporate form can be disregarded in deciding who may be liable as an "employer" under Title VII. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993) (noting, but not applying, alter ego theory in finding parent corporation not liable for employment discrimination by subsidiary corporation); *see also Roberts v. Air Capitol Plating, Inc.,* 1997 WL 446266, at *8–9 (D.Kan. July 22, 1997) (permitting plaintiff to amend her complaint to allege individual liability under alter ego theory in employment discrimination case, and finding that

*Haynes* does not stand for the proposition that an individual can never be held liable as an employer for discrimination under Title VII).

Ultimately, the court need not decide whether the Tenth Circuit or the Kansas Supreme Court would recognize individual liability in the alter ego context because plaintiff has not come forward with any evidence from which a reasonable jury could conclude that the individual defendants were alter egos of defendant MRG. *See Land v. Midwest Office Technology, Inc.,* 114 F.Supp.2d 1121, 1148–50 (D.Kan. 2000) (declining to expressly decide whether individuals may be held liable under anti-discrimination statutes by virtue of alter ego theory where plaintiff's evidence was simply insufficient to show alter ego status; granting individual defendants' motion for summary judgment on Title VII, ADA and KAAD claims). In fact, plaintiff suggests only that because the individual defendants are partners of MRG, they are necessarily alter egos of MRG. In the absence of any evidence shedding any light on whether the individual defendants dominated finances, policy and practices such that MRG had no separate mind, will or existence of its own, no genuine issues of fact exist concerning whether the individuals are alter egos and summary judgment in their favor is appropriate. *See Doughty v. CSX Transportation, Inc.,* 258 Kan. 493, 497, 905 P.2d 106 (1995) (courts will disregard the fiction of a separate legal entity when there is such

domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for the principal); *NLRB v. Greater Kansas City Roofing,* 2 F.3d 1047, 1052 (10th Cir.1993) (in analyzing alter ego theory, court must examine whether the personalities and assets of the corporation and the individual are indistinct).[7]

**5. Damages**

Defendants move for summary judgment on plaintiff's claim for damages under the KAAD to the extent plaintiff seeks more than $2000 for pain and suffering and to the extent she seeks to recover punitive damages. Defendants assert that punitive damages are not available under the KAAD and that damages for pain and suffering are limited to $2000. In her papers, plaintiff acknowledges that in *Woods v. Midwest Conveyor Co.,* 231 Kan. 763, 648 P.2d 234 (1982), the Kansas Supreme Court held that punitive damages are not available under the KAAD. *Id.* at 776, 648 P.2d 234. Nonetheless, she contends that the Kansas Supreme Court, if faced with the issue today, would conclude that punitive damages are available when a plaintiff pursues an independent tort action in state or federal district court. It is not the place of this court, however, to expand Kansas state law beyond the bounds set by the Kansas Supreme Court. *See Proctor & Gamble Co. v. Haugen,* 222 F.3d 1262, 1280 (10th Cir.2000); *Sellers v.*

7. Plaintiff also argues, although she dedicates only one sentence to the argument, that the partners should be held individually liable pursuant to K.S.A. §§ 56a–306(a) and 56a–307(b), provisions in the Kansas Uniform Partnership Act which provide that partners are jointly and severally liable for all obligations of the partnership and that an action may be brought against the partnership and any or all of the partners. Moreover, while defendant MRG is now a limited liability partnership, it was a general partnership during all times relevant to plaintiff's suit. Plaintiff has provided the court with no authority suggesting that this default rule of partnership law would supersede those cases that hold, in the specific context of employment discrimination, that individual liability is not appropriate. The court, in its own research, has found no cases discussing this issue. Thus, in the absence of such authority, the court declines to adopt plaintiff's argument.

*Allstate Ins. Co.*, 82 F.3d 350, 352 (10th Cir.1996) (duty of federal court is to ascertain and apply the most recent statement of state law by the state's highest court). With respect to plaintiff's claim for damages for pain, suffering and humiliation, defendants are correct that the law presently limits those damages to $2000. *See* K.S.A. § 44–1005(k) (presiding officer in hearing before KHRC may not award damages for pain and suffering in excess of $2000); *Best v. State Farm Mutual Automobile Ins. Co.*, 953 F.2d 1477 (10th Cir.1991) (KAAD limits recovery of damages for pain and suffering to a maximum of $2000, whether issued by Commission or by a court). While plaintiff again argues that the Kansas Supreme Court would hold otherwise if presented with the issue today, the court is bound by the Tenth Circuit's decision in *Best. See United States v. Spedalieri*, 910 F.2d 707, 709 & n. 2 (10th Cir.1990). Indeed, the Circuit in *Best* rejected many of the arguments that plaintiff presents in her papers.

In sum, plaintiff will not be permitted to recover punitive damages in connection with her failure-to-hire claim under the KAAD and any damages she recovers for pain and suffering will be limited to $2000.

### C. Retaliatory Discharge Claim

 Plaintiff also asserts that defendants terminated her employment in retaliation for plaintiff's refusal to sign defendant MRG's Medicare Compliance Plan-a document that plaintiff refused to sign based on her purported belief that MRG, in violation of Medicare rules and regulations, was improperly billing plaintiff's services as a locum tenens physician when, in fact, she did not qualify as a locum tenens physician. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896,

752 P.2d 685 (1988). As the Court noted in *Palmer:*

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id.* at 900, 752 P.2d 685. To establish this claim, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the employee's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and that the employee was discharged in retaliation for making the report. *Id.* In addition, the "whistle-blowing" must have been done out of a good faith concern over the wrongful activity reported rather than a from a corrupt motive such as malice, spite, jealousy or personal gain. *Id.*

According to defendant, summary judgment is warranted on plaintiff's retaliatory discharge claim because plaintiff never actually reported any violation concerning defendants' billing for her services and because defendants, prior to the time when plaintiff allegedly blew the whistle, were already aware of the potential problem concerning the billing for plaintiff's services and had started taking steps to correct that problem. The court, howev-

er, declines to address these specific arguments at this juncture in light of its conclusion that plaintiff's relationship with defendant MRG was not an employee-employer relationship but rather an independent contractor relationship.[8] While defendants do not argue in their papers that plaintiff's retaliatory discharge claim should be dismissed on the grounds that plaintiff was an independent contractor, the court believes that this issue should be addressed as the clear majority of cases to decide the issue have held that whistleblower protection does not extend to independent contractors. *See, e.g., United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 2003 WL 303142, at *14–17 (E.D.Pa. Feb.11, 2003) (independent contractor could not maintain retaliation claim under California whistleblower statute or claim for wrongful discharge in violation of public policy); *DaBronzo v. Roche Vitamins, Inc.*, 232 F.Supp.2d 306, 310–14 (D.N.J.2002) (under New Jersey law, as predicted by federal district court, whistleblower protection afforded by state statute did not extend to independent contractors) (collecting cases); *Ebelt v. County of Ogemaw*, 231 F.Supp.2d 563, 576 (E.D.Mich.2002) (following Michigan Court of Appeals' decision that state Whistleblower Protection Act did not apply to independent contractors); *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 683–84 (Iowa 2001) (no cause of action exists in Iowa for retaliatory discharge of an independent contractor). However, because defendants did not raise the issue and, thus, plaintiffs have not had an opportunity to examine what authorities, if any, might support such a claim, the court will provide plaintiff an opportunity to brief the issue for

the court. In that regard, plaintiff is hereby ordered to show cause in writing no later than Monday, April 14, 2003 why her retaliatory discharge claim should not be dismissed. If she does not respond by that date, her claim will be dismissed. If she does respond, the defendants shall have until April 21, 2003 to reply. If the court concludes that plaintiff can show good cause and the court concludes that she is entitled to whistleblower protection under Kansas law, then the court will address the specific arguments raised by defendants in its motion for summary judgment.

*D. Tortious Interference with Prospective Business Advantage*

■ Finally, plaintiff asserts a claim for tortious interference with a prospective business advantage based on defendants' conduct after plaintiff started her own radiological practice. Specifically, plaintiff claims that defendants unlawfully converted a motorized viewer from Mercy Health Center such that plaintiff was no longer able to use this viewer in connection with her practice and that defendants read and interpreted certain x-rays at Mercy Health Center despite the fact that the ordering physicians had requested that plaintiff read these x-rays. Defendants move for summary judgment on plaintiff's tortious interference claim on the grounds that plaintiff has failed to establish that defendants engaged in conduct that is "independently actionable." The court agrees with defendants and, thus, grants summary judgment in their favor on this claim.

■ Kansas recognizes a claim for tortious interference with a prospective busi-

---

**8.** Defendants' contention that they began taking steps to alleviate any potential problem concerning its billing practices is the second issue upon which plaintiff seeks to file a surreply. Because the court declines to address

this issue, no surreply is necessary and the court denies plaintiff's request to the extent she seeks to provide additional information on this issue.

ness advantage. *See Noller v. GMC Truck & Coach Div.*, 244 Kan. 612, 620, 772 P.2d 271 (1989) (citing *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986)). In addition, the Tenth Circuit has held that Kansas would adopt the competitor privilege stated in Restatement (Second) of Torts § 768 (1979) and that Kansas would interpret the "wrongful means" element of section 768 to require "independently actionable" conduct. *See DP–Tek, Inc. v. AT & T Global Information Solutions Co.*, 100 F.3d 828, 832–35 (10th Cir. 1996). Both parties agree that the principles set forth by the Circuit in *DP–Tek* apply to this case. The parties diverge only with respect to whether defendants engaged in "independently actionable" conduct.

■ Turning to plaintiff's claim that defendants unlawfully converted a motorized viewer from Mercy Health Center, defendants' evidence demonstrates that the viewer was not "converted" or "stolen" by defendants as plaintiff suggests, but rather that defendants purchased the viewer from Mercy Health Center. In that regard, defendants have submitted the affidavit of James Kirkbride, Director of Radiology at Mercy Health Center during the relevant time period, in which Mr. Kirkbride avers that he had the authority to sell the viewer and that he sold the viewer to defendants. He also avers that he received a check from defendants for the purchase price of the viewer and that the viewer was not stolen or converted. Plaintiff's evidence on this subject is insufficient to create a genuine issue of fact concerning whether the viewer was stolen by defendants. Plaintiff highlights testimony from Richard Allen, the President and CEO of Mercy Health Center, in which Mr. Allen states that it was "highly unlikely" that Mercy Health Center would have sold to defendants "any dictation equipment, reading equipment." Plaintiff, however, has not shown (or even suggested) that the sale of such equipment would be a matter about which Mr. Allen would have personal knowledge. In fact, Mr. Allen testified that if Mercy Health had sold any equipment to defendants, then that sale would have been handled by Mr. Kirkbride. Mr. Allen's testimony, then, in no way undermines Mr. Kirkbride's testimony concerning the sale of the equipment to defendants. In short, no reasonable jury could conclude, based on Mr. Allen's testimony, that defendants stole the viewer from Mercy Health Center. The only other evidence plaintiff offers in support of her theory that defendants unlawfully converted the viewer is her own testimony that Mr. Kirkbride told her that the viewer had been "moved" to defendants' office "without his knowledge." This statement, however, constitutes inadmissible hearsay, is ambiguous and in any event is insufficient to permit a reasonable jury to conclude that defendants converted the equipment. Because no reasonable jury could conclude that defendants converted the viewer, plaintiff has not shown that defendants engaged in "independently actionable" conduct with respect to the motorized viewed. Summary judgment, then, is warranted on this theory.

■ With respect to plaintiff's theory that defendants improperly read x-rays that were designated for her,[9] the uncontroverted evidence shows that Mercy

---

9. Defendants also move for summary judgment on this theory on the grounds that it was not preserved in the pretrial order. The court declines to address this argument in light of its conclusion that summary judgment is appropriate on the merits of the claim. Moreover, because the issue of whether plaintiff preserved this theory in the pretrial order is the third and final issue upon which plaintiff seeks to file a surreply, the motion for leave to file the surreply is denied.

Health Center, after plaintiff started her own practice, developed a plan to have referring physicians fill out a form designating whether they wanted plaintiff or defendants to read their x-rays. Pursuant to this plan, Mercy Health Center's x-ray technologists who took the x-rays were responsible for sorting the films into groups for defendants and for plaintiff. Plaintiff's films were separated into one folder and defendants' films were placed in another folder by the technologists. Plaintiff claims that defendants read films that were designated for her. Significantly, plaintiff does not claim that defendants removed films from her folder. Indeed, she concedes that the technologists employed by Mercy Health Center, on occasion, inadvertently placed some films in the wrong folder and that defendants simply read the films contained in their own folder. Even assuming that defendants' reading of these x-rays violated the written instructions of the ordering physicians and/or the procedures established by Mercy Health Center, plaintiff has not shown how such conduct would be "independently actionable." Summary judgment, therefore, is appropriate on this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. # 78) is granted in part and denied in part and plaintiff's motion for leave to file a surreply (doc. # 88) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff shall show cause in writing no later than **Monday, April 14, 2003** why her retaliatory discharge claim should not be dismissed. If she does not respond by that date, her claim will be dismissed. If she does respond, the defendants shall have until **April 21, 2003** to reply.

**IT IS FURTHER ORDERED BY THE COURT THAT** this case is set for trial beginning **Tuesday, May 27, 2003 at 9:30 a.m.**

**IT IS SO ORDERED.**